UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **FELICE TSHETA MITI,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **26-11327-BEM** |
| | ) | |
| **ANTOINE MONIZ, et al.,** | ) | |
| | ) | |
| **Respondents.** | ) | |
| | ) | |

**MEMORANDUM AND ORDER**
**ON PETITION FOR WRIT OF HABEAS CORPUS**

**MURPHY, J.**

When an individual is detained under 8 U.S.C. § 1226(a), which governs the lion's share of immigration-related civil detention in the United States, he is entitled to a bond hearing before an immigration judge.[1] *Hernandez-Lara v. Lyons*, 10 F.4th 19, 26 (1st Cir. 2021). At that bond hearing, the immigration judge may decide to continue detention only after finding that the individual is a flight risk or a danger to the community. *Id.* at 27. On both points, the Constitution requires that the Government bear the burden of proof.[2] *Id.* at 39–40. As to dangerousness, the Government is required to carry its burden by "clear and convincing evidence." *Id.* at 40.

District courts retain habeas jurisdiction to ensure that immigration bond hearings are conducted within constitutional bounds. *See Ortega-Rangel v. Sessions*, 313 F. Supp. 3d 993,

---

[1] More precisely, the Attorney General is empowered to release detained individuals. 8 U.S.C. § 1226(a). That authority has been delegated by regulation to the immigration courts. 8 C.F.R. § 1003.19.

[2] According to the regulations, the burden is on the individual. *In Re Guerra*, 24 I. & N. Dec. 37, 38 (BIA 2006). However, in *Hernandez-Lara v. Lyons*, 10 F.4th 19, 39 (1st Cir. 2021), the First Circuit held that the Due Process Clause requires placing that burden on the Government.

1001 (N.D. Cal. 2018) (granting petition); *Garcia v. Hyde*, — F. Supp. 3d —, 2025 WL 3466312, at *5–6 (D.R.I. Dec. 3, 2025) (same).   One way courts perform this function is by assessing whether "the government's evidence could . . . , as a matter of law, establish clearly and convincingly that [an individual] was dangerous, and therefore [whether] he was . . . accorded the process he is due." *Cepeda v. Shanahan*, 2016 WL 3144394, at *2 (S.D.N.Y. Apr. 22, 2016) (staying habeas proceedings pending decision by the Board of Immigration Appeals); *accord Hechavarria v. Whitaker*, 358 F. Supp. 3d 227, 240 (W.D.N.Y. 2019) (granting petition); *Diaz Ortiz v. Smith*, 384 F. Supp. 3d 140, 143 (D. Mass. 2019) (denying petition).

In this case, Petitioner Felice Tsheta Miti was denied bond based on a single piece of evidence: a police report describing a delayed allegation of misdemeanor assault, where the officers observed no physical injuries and where charges were ultimately dropped.  *See* Dkt. 8-2. Because the Court concludes that this was insufficient, as a matter of law, to support the immigration judge's finding, the Court will grant this Petition and order Petitioner's release.

## I.    Background

Petitioner is a citizen of the Democratic Republic of Congo who last entered the United States in 2022 on a student visa.[3]  Dkt. 8 at 3.  Respondents assert that Petitioner "failed to depart the United States as required by law." *Id.* (citing the Petition).  However, the record reflects that Petitioner applied for asylum by January 2023 and, as a result, received permission to remain and work in the United States pending the outcome of his application.[4]  Dkt. 1-4 at 6, 23.

---

[3] It is unclear when Petitioner first entered the United States.  One of Petitioner's affiant supporters refers to meeting him as a student in the United States in 2021.  *See* Dkt. 1-4 at 22.

[4] When an individual with a pending (affirmative) asylum application is placed in removal proceedings, the immigration court assumes jurisdiction over the application.  8 C.F.R. § 208.2(b).

On April 2, 2025, Petitioner was arrested after police officers responded to a report of domestic assault.[5]  Dkt. 8-2 at 5.  The details of this incident are recorded in two narrative statements: an incident report (and near-identical affidavit in support of arrest) prepared by the arresting officer and a summary of an interview with the complaining witness, conducted the following day by a detective.  *Id.* at 5–8.

In the incident report, the officer stated that the "caller . . . told dispatch she did not tell [the police] when they were at the address within the hour for a verbal domestic that her husband [Petitioner] hit her in the head" but told dispatch he was "now refusing to bring the baby back." *Id.* at 5.  The officer further stated that, "[u]pon arrival, . . . [Petitioner] was in the apartment with their baby" and that the caller "said she was scared to say something about being assaulted earlier by [Petitioner] and getting the police involved but the back of her head hurt and needed to be seen by medical."  The officer stated that he "could not see any injuries on her head as she complained about head pain," and that, "[Petitioner] when asked about the incident [denied] assaulting [the complaining witness] at all." *Id.*

At the scene, the officer performed an Ontario Domestic Assault Risk Assessment ("ODARA"), yielding a score of 4.[6]  *Id.*  Later, the officer requested that bail be set at $300 and include no contact with the complaining witness.  *Id.* at 8.  It appears that bail was granted because Petitioner "came in the lobby the following day to show [the officer] what [Petitioner] [said] [were] scratches from [the witness] during [the] incident." *Id.* at 5.  The officer stated that he "again asked

---

[5] The report lists the offense as a class-D "misdemeanor" "domestic violence assault."  Dkt. 8-2 at 3.

[6] "ODARA is an actuarial risk assessment tool for predicting [intimate partner violence] recidivism based on data available to police officers at the scene of an assault. . . . A final ODARA score ranges from 0 (which indicates a 7% chance of recidivism within 5 years) to 13 (a 77% chance of recidivism), with most scores falling between 1 and 6." Mac Walton, *Bail Reform and Intimate Partner Violence in Maine*, 71 Me. L. Rev. 139, 168 (2018).  Maine police officers are generally required to administer an ODARA in domestic violence cases.  *See* Me. Rev. Stat. tit. 19-A, § 4114(6)(E).

why none of this was brought up before until now" and that a "photograph [would] be attached to [the] report," *id.*, although none was included with the Department of Homeland Security's ("DHS") later submission to the immigration court.

The day after the incident, a detective and domestic violence investigator met with the complaining witness. *Id.* at 6. As recorded in her interview summary, the witness stated that she and Petitioner "used to be engaged but [were] no longer engaged"; that they "met through work and [Petitioner] [was] currently her supervisor"; and that the two cohabitated and had a fifteen-month-old daughter together. *Id.* When asked about any prior, unreported instances of assault between the two of them, the witness stated that Petitioner "only assaulted her one other time[:] [the witness] said they were in the car together and she was pregnant . . . . [She] and [Petitioner] had been arguing and [Petitioner] slapped her on the face." *Id.*

Regarding the previous day's incident, the witness described an argument that was, by her account, precipitated by the witness's not being available to watch their child (because she was, herself, at work) at a time when Petitioner was apparently supposed to go to work. In the interest of transparency, the Court quotes from the interview summary at length:

[The witness] said she got home and saw that [Petitioner] was loading their daughter into the car seat. [The witness] said she went and got her daughter and was going to bring her inside. [Petitioner] got mad and they got into, what she described as pulling the baby back and forth between the two of them. [The witness] said this caused their daughter to cry extremely loud and she described it as a cry she knew was not okay. [The witness] said she let [Petitioner] have the baby to prevent any injuries to her. [The witness] said [Petitioner] then went into the house with their daughter and went to a bedroom. [The witness] and [Petitioner] continued to fight verbally. During the verbal altercation [Petitioner] was still holding their daughter in his arms. [The witness] said that [Petitioner] was intimidating her by [lunging] towards her with his hand in a fist and pretending to swing at her. [The witness] said he did this intimidation movement two times. When [Petitioner] did this she would tuck her head towards her chest and use her hands and arms to shield her face as she believed he was going to hit her. On the third time [Petitioner] did this he actually punched [the witness] in the back of the head with a closed fist. [The witness] said this was painful and said she still had a headache today.

. . .

[The witness] said that [Petitioner] then called the cops and she was yelling in the background when he was on the phone trying to tell the dispatcher that she needed police. Once the police arrived [the witness] said [Petitioner] was manipulative to them and made it seem like she was the issue and said there was [no] physical altercation. [The witness] said she did not tell the police about the punch because she still wanted to cover for him and protect him. The police left the residence and no arrest was made. Both [the witness] and [Petitioner] got disorderly conduct warnings.

[The witness] said she called her mother and told her what happened and disclosed to her mother that [Petitioner] had punched her in the head. [The witness] said her mother was aware of the first time [Petitioner] assaulted her and her mother was adamant that [the witness] report this to police. [The witness] said [now] she realized the, "gravity" of the situation and agreed she needed to report this to the police. [The witness] said she contacted the police and reported it and [Petitioner] was arrested.

*Id.* at 6–7. The summary concludes with a general note: "It is not uncommon for victims of domestic violence to minimize, omit from, or alter their account of an incident for many reasons, which could include but are not limited to: fear of further abuse." *Id.* at 7.

Sometime before February 20, 2026, DHS initiated removal proceedings against Petitioner and detained him on that basis.[7]  *See* Dkt. 1-3 at 2.  Petitioner then moved for release on bond or on his own recognizance in immigration court.  *Id.*  Along with his motion, Petitioner submitted evidence intended to demonstrate that he was neither a flight risk nor a danger to the community, including documentation of his immigration status and work history, proof of his ties to the local community, as well as twelve 'affidavits of good character' from friends, colleagues, community leaders, and from Petitioner's fiancée and her family.[8]  *See generally* Dkts. 1-4, 1-6.  DHS submitted only the police records described above.  *See generally* Dkt. 8-2.  Petitioner then supplemented the evidentiary record with the formal dismissal of the assault charge.  *See generally* Dkt. 1-7.  That dismissal, which was filed by the Maine Assistant District Attorney only about a week prior, on February 17, 2026, states: "The victim has moved out of the State of Maine and is unwilling and unable to return to Maine; the State cannot proceed without the cooperation of the victim in this case."  *Id.* at 3.

On March 2, 2026, an immigration judge conducted a bond hearing and denied Petitioner's request for bond, finding him a "Danger to the community":

**ORDER OF THE IMMIGRATION JUDGE**

The respondent requested a custody redetermination pursuant to 8 C.F.R. § 1236. After full consideration of the evidence presented, the respondent's request for a change in custody status is hereby ordered:

☑  Denied, because
Danger to the community

---

[7] This is the date on which Petitioner moved for release.  Dkt. 1-3 at 2.

[8] To be clear, this is not the complaining witness discussed above, who described herself as Petitioner's ex-fiancée.  *See* Dkt. 8-2 at 6.

Dkt. 8-1 at 1.  Petitioner thus continues to be detained at the Plymouth County House of Corrections, a prison facility.  Dkt. 1-3 at 2.

## II.    Procedural History

On March 18, 2026, Petitioner sought a writ of habeas corpus in this Court, principally arguing that the immigration judge failed to place the burden of proof on the Government or otherwise failed to require clear and convincing evidence before denying bond on account of his purported dangerousness, in violation of the Due Process Clause.[9]  Dkt. 1 at 1, 4–7.

On March 23, 2026, Respondents answered.  Dkt. 8.  As this Petition raises only questions of law, the Court has decided it on the papers.

## III.    Discussion

### A.    Jurisdiction

The Court has jurisdiction under 28 U.S.C. § 2241.  Respondents argue that the Court's typical habeas jurisdiction is withdrawn under 8 U.S.C. § 1226(e) insofar as Petitioner seeks review of the immigration judge's "discretionary judgment."  Dkt. 8 at 7–12.  But constitutional challenges to detention, such as Petitioner raises here, are not barred under that provision.  *Ercelik v. Hyde*, 2025 WL 1361543, at *6 (D. Mass. May 8, 2025) (citing *Demore v. Kim*, 538 U.S. 510, 517 (2003)) ("The First Circuit agrees." (citing *Hernandez-Lara*, 10 F.4th at 33–34)).

Of course, this is not to say that the Court's jurisdiction is unlimited.  The "constitutional restraints applicable to all government action" do "cabin[] the discretion granted" to the Attorney General and so that which is, by her, delegated to the immigration courts.  *Hernandez-Lara*,

---

[9] Adjacently, Petitioner asserts that his civil detention is "effectively" an unconstitutional "substitute[] for criminal punishment."  Dkt. 1 at 6.  Somewhat more distinctly, Petitioner argues that the immigration judge's "failure to provide a reasoned and individualized determination" violated his right to due process.  *See* Dkt. 1 at 5–6.  The Court need not reach these arguments but does discuss, *infra*, the immigration judge's written order as it relates to Petitioner's primary claim.

10 F.4th at 34.  However, "within those limits[,] the government maintains discretion in each case to grant or deny bond."  *Id.*  The Court's task is therefore simply to ascertain whether the immigration court's discretion was exercised in a manner consistent with due process.[10]

## B.    Exhaustion

Respondents argue that the Court should decline to exercise its jurisdiction as Petitioner has not yet exhausted his administrative remedies.  Dkt. 8 at 12–14.  In particular, Petitioner's bond determination may still be reviewed by the Board of Immigration Appeals ("BIA"), which could itself find that the immigration judge erred in denying bond.[11]  As an intermediate step,

---

[10] The Court notes a slight disconnect in the language used for these analyses, which might in turn shed some light on the dispute.  Evidentiary standards, such as the clear and convincing standard, typically pertain to factual findings, which are reviewed for (in federal court, clear) "error."  *See Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 168 (2d Cir. 2001) (explaining the standards for appellate review).  By contrast, discretionary decisions, having no singular 'right' or 'wrong' answer, are usually judged according to a "range of permissible decisions," within which the reviewed ruling must be found to fall.  *Id.* at 168–69.  Both standards are inherently deferential to the lower court but for different reasons.  *See id.*

Under the First Circuit's decision in *Hernandez-Lara*, in conjunction with the regulations imposed by the Attorney General, an immigration court's bond decision (at least as a habeas court might encounter it) more closely resembles a set of factual findings and legal conclusions than a truly 'discretionary' decision.  *Cf. United States v. Tortora*, 922 F.2d 880, 882–83 (1st Cir. 1990) (reviewing district court's pre-trial detention decision for clear error).  That is because, under the regulations, an immigration judge is required to make certain factual findings (as to dangerousness and flight risk) before *granting* release.  *See, e.g.*, *Matter of Urena*, 25 I. & N. Dec. 140, 141 (BIA 2009) (reviewing those findings for "error").  Conversely, under the Due Process Clause, as interpreted in *Hernandez-Lara*, an immigration judge must make certain factual findings before *denying* release.  *See* 10 F.4th at 39.  The sum of these is that the immigration judge's 'discretionary' decision is cabined on both sides and, as a practical matter, ends up being more-or-less determined by the factual findings.

[11] The record reflects that Petitioner reserved the right to appeal his bond decision, Dkt. 8-1 at 2, but does not make clear whether he has yet done so, *see id.* (stating that the appeal would be due April 1, 2026).

8

Petitioner might have waited for the immigration judge to issue a full written decision, explaining the denial, as happens only after a bond determination is formally appealed.[12]

Under these circumstances, the Court will not require exhaustion. As Respondents acknowledge, there is no statutory requirement that a petitioner exhaust his administrative remedies before seeking habeas relief under 8 U.S.C. § 2241. *Id.* at 12–13. Accordingly, "sound judicial discretion governs." *Morgan v. Garland*, 120 F.4th 913, 927 (1st Cir. 2024) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992)). The Supreme Court has identified several "broad sets of circumstances in which the interests of the individual weigh heavily against requiring administrative exhaustion," including where "a particular [litigant] may suffer irreparable harm if unable to secure immediate judicial consideration of his claim." *McCarthy*, 503 U.S. at 146. Here, every day Petitioner spends in prison is irreparable harm. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) (calling "[t]he interest in being free from physical detention by one's own government" "the most elemental of liberty interests"); *Ferrara v. United States*,

---

[12] Petitioner argues that the immigration judge's failure to issue a contemporaneous written decision explaining her reasoning violated his due process rights. Dkt. 1 at 5–6. The Court need not reach this argument but notes that, setting aside the question of whether the practice is constitutional, it is at least standard. *See* U.S. Dep't of Justice, Exec. Off. for Immigration Rev., *Immigration Court Practice Manual*, § 9.3(e)(vii) (Feb. 20, 2020), https://www.justice.gov/eoir/media/1052736/dl?inline [https://perma.cc/5XDU-ME8E] ("Usually, the Immigration Judge's decision is rendered orally. Because bond hearings are generally not recorded, the decision is not transcribed. If either party appeals, the Immigration Judge prepares a written decision based on notes from the hearing.").

Relevant to Petitioner's argument (and the question of how to deal, as a matter of exhaustion, with the fact that a written decision might be forthcoming) is the timeline on which such decisions issue. Unfortunately, the regulations provide no guidance. When DHS (rather than an individual) appeals an immigration judge's *grant* of release or bond, the immigration judge must issue a full written decision "within five business days . . . or . . . as soon as practicable thereafter (not to exceed five additional business days)." 8 C.F.R. § 1003.6(c)(2). In that situation, urgency comes, in part, from the fact that the release order is automatic stayed, under the regulations, by DHS's notice of appeal. *See* 8 C.F.R. §§ 1003.6(c), 1003.19(i)(2). *But see Sampiao v. Hyde*, 799 F. Supp. 3d 14, 34 (D. Mass. 2025) (concluding that the automatic stay regulations violated a petitioner's due process rights). When an *individual* appeals the *denial* of release or bond, written policy does seem to contemplate that the immigration judge's decision will be added to the record of proceedings within 21 business days (roughly, a month). *See* U.S. Dep't of Justice, Exec. Off. for Immigration Rev., *Uniform Docketing System Manual*, at VIII-5 (Feb. 2021), https://www.justice.gov/eoir/reference-materials/UDSM122020/dl [https://perma.cc/6H3D-BQE7]. However, it appears that the only consequence of an immigration judge's missing this benchmark is that "the BIA will issue a short order remand for inclusion" of the written decision. *Id.*

370 F. Supp. 2d 351, 360 (D. Mass. 2005) ("Obviously, the loss of liberty is a . . . severe form of irreparable injury."). Even if one finds it appropriate to stomach some amount of detention before declaring irreparable harm, "[t]he BIA appeals process is long." *Rodriguez v. Bostock*, 779 F. Supp. 3d 1239, 1248 (W.D. Wash. 2025). "In 2024"—before the recent surge in immigration-related detention[13]—"[Executive Office for Immigration Review] data showed an average processing time of 204 days for bond appeals" and that "200 bond appeal cases took a year or longer to resolve." *Id.* (internal quotation marks and citation omitted). Thus, where Petitioner's claim is that such imprisonment is unlawful, this factor "weigh[s] heavily against requiring administrative exhaustion." *McCarthy*, 503 U.S. at 146.

The countervailing considerations—namely, "protecting administrative agency authority and promoting judicial efficiency," *id.* at 145—are mitigated under the circumstances. As an initial matter, the Executive has already twice had the opportunity to weigh in on Petitioner's detention: when DHS decided to hold Petitioner in custody, *see* 8 C.F.R. § 236.1(c)(8), and then again when the immigration court denied his release, *see id.* § 1003.19.

Individual petitioners are, moreover, appropriately incentivized to develop their administrative records before pursuing habeas relief, such that the Court need not rigidly police the decision. Generally speaking, a due process violation may be shown either by directly identifying a defect in the process or by inferentially arguing that the final outcome was so unfounded that it could not have been reached without procedural failure. Thus, for someone in Petitioner's position, there are effectively two options: he can either directly attack some part of

---

[13] *See* Chloe N. East, Caitlin Patler & Elizabeth Cox, *ICE Arrests across Trump's First and Second Terms: Variation in Targeting, Method, and Geography* at 1 (Nat'l Bureau of Econ. Rsch, Working Paper No. 34794, revised March 2026), http://www.nber.org/papers/w34794 ("[I]n 2025, average daily ICE arrests were higher than any time in the past 10 years.").

the bond process, for example, by "point[ing] to the language of the immigration judge's opinion," *Diaz Ortiz*, 384 F. Supp. 3d at 143, or else he can inferentially argue that "'the evidence itself could not – as a matter of law – have supported' the immigration judge's decision." *Id.* (quoting *Hechavarria*, 358 F. Supp. 3d at 240). The latter is certainly the narrower path, as a petitioner must argue not only that his immigration judge erred but that, under the circumstances, no reasonable immigration judge could have come to the same conclusion. By filing this Petition based on the naked evidentiary record, Petitioner has chosen the more difficult track, and the Court is disinclined to tell him he cannot.[14]

### C.    Merits

On the merits, the Court considers whether the evidence presented by DHS to the immigration judge was sufficient to conclude, by clear and convincing evidence, that Petitioner is a danger to the community, *see Diaz Ortiz*, 384 F. Supp. 3d at 143, and finds that it was not.

The mere fact that the assault charge against Petitioner was dismissed does not automatically cancel out its evidentiary value, "as even charges that do not result in a conviction can form the basis for denial of relief." *See Lee v. Barr*, 975 F.3d 69, 76 (1st Cir. 2020) (finding no abuse of discretion in an immigration judge's reliance "on the detailed substance of [a police] report, including the officer's recitation of what he observed," in denying a motion to continue proceedings, even though the charges stemming from the reported incident were dismissed); *see*

---

[14] Petitioner does "point to" the immigration judge's literal order (rather than her yet-unissued explanatory decision), *cf. Diaz Ortiz*, 384 F. Supp. 3d at 143, which laconically states that bond was "Denied, because Danger to the community." Dkt. 1-8. Petitioner argues that the Court can infer from the absence of any reference to the clear and convincing standard that it was not applied. Dkt. 1 at 6–7. Indeed, the Court can confirm, having seen many of these bond orders, that they do often refer to the applied standard, even if only in a conclusory manner—*e.g.*, "Flight risk by preponderance of the evidence." On one hand, Petitioner's requested inference feels like an unreasonably critical 'gotcha,' particularly where a more fulsome explanation might be forthcoming. *See supra* note 12. On the other hand, it is arguably the least one could ask: that the agency make clear whether it is intending to follow the law of the Circuit within which it is operating. Here, the Court assumes that the immigration judge at least intended to apply the correct standard, notwithstanding the omission.

*also In Re Guerra*, 24 I. & N. Dec. 37, 38 (BIA 2006) (approving use of any "probative and specific" evidence in the record).[15]    Likewise, an immigration judge "is not bound by formal hearsay rules," although "[h]ighly unreliable hearsay might raise due process problems."  *Yongo v. INS*, 355 F.3d 27, 31 (1st Cir. 2004).  As such, the immigration judge did not necessarily err by considering the fact of arrest and charge, nor by considering the hearsay (and double-hearsay) testimony embodied in the police reports.

At the same time, "a sufficiency analysis" does require "some degree of intellectual rigor," as it violates due process to "give credence to 'evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative.'"  *United States v. Pothier*, 919 F.3d 143, 146 (1st Cir. 2019) (quoting *Leftwich v. Maloney*, 532 F.3d 20, 23 (1st Cir. 2008)).  Accordingly, the immigration judge, like any trier of fact, was responsible for "draw[ing] reasonable inferences from basic facts to ultimate facts," taking into consideration the appropriate standard of proof.  *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Here, "clear and convincing evidence" was required.  *Hernandez-Lara*, 10 F.4th at 40. "The clear and convincing standard is a demanding standard to satisfy."  *United States v. Anonymous Appellant*, 85 F.4th 576, 580 (1st Cir. 2023).  The Supreme Court has described clear and convincing evidence as

> evidence which "produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue."

---

[15] *In re Guerra* is partially abrogated by *Hernandez-Lara*. *See* 10 F.4th at 27, 39. To the extent not abrogated, or otherwise contrary to law, the Court treats it and other decisions by the BIA as helpful "guidance." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 388 (2024) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944)).

*Cruzan by Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 285 n.11 (1990) (alteration in original) (quoting *Matter of Jobes*, 108 N.J. 394, 407 (1987)). "In detention cases, applying [this] heightened 'standard of proof . . . reflects the value society places on individual liberty,' and avoids the risk associated with the preponderance standard of 'increasing the number of individuals erroneously committed.'" *Hernandez-Lara*, 10 F.4th at 39–40 (ellipsis in original) (internal citation omitted) (quoting *Addington v. Texas*, 441 U.S. 418, 425 (1979)).

With this framework in mind, the Court reviews the "basic facts" and considers what "reasonable inferences" might be drawn from them. *See Jackson*, 443 U.S. at 319. Most basically, Petitioner was arrested and charged with misdemeanor domestic assault, Dkt. 8-2 at 3, which reasonably implies that the officers (and, later, the prosecuting attorney) then believed there to be at least probable cause that Petitioner assaulted the complaining witness.[16] That being said, at the scene, the arresting officer calculated an ODARA score of 4 (out of 13), *id.* at 5, which—even taking for granted that the underlying assault, in fact, occurred—implies only a 39% chance of recidivism within five years.[17] This, in turn, contextualizes the arresting officer's fairly modest request that bail be set at $300, along with a standard no-contact order between Petitioner and the reporting witness, and that bail does appears to have been granted.[18] *See id.* at 5, 8. Taken together,

---

[16] "Probable cause to arrest depends 'upon whether, at the moment the arrest was made . . . the facts and circumstances within (the arresting officers') knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'" *Adams v. Williams*, 407 U.S. 143, 148 (1972) (alterations in original) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

[17] *See* Maine Coal. to End Domestic Violence & Violence Intervention P'ship of Cumberland Cnty., *Ontario Domestic Assault Risk Assessment: Maine Guidelines & General Scoring Criteria* 15 (2019), https://dirigosafety.com/wp-content/uploads/2020/09/ODARA-guidelines-booklet-FINAL-x3.pdf [https://perma.cc/TE76-Y9UJ].

[18] *See Hearing on L.D. 1817 Before the J. Standing Comm. on Criminal Justice & Pub. Safety* (Me. 2025) (statement of Andrea Mancuso, Pub. Pol'y Dir., Me. Coal. to End Domestic Violence), https://legislature.maine.gov/legis/bills/getTestimonyDoc.asp?id=192403 [https://perma.cc/XY9S-UQ8R] ("When a person is charged with a domestic violence crime, conditions of release are almost always issued that include prohibiting the defendant from having any contact with the victim, a requirement to stay away from their home, school or place of business, and a restriction on access to weapons.").

13

the actions and statements of the individuals who first responded to the alleged assault do not support a strong inference that those actors perceived Petitioner as a dangerous person, at least on an ongoing basis, notwithstanding the criminal context of their encounter.

This leaves the complaining witness's testimony. Before examining that testimony more closely, it bears repeating the investigating detective's general advisement: "It is not uncommon for victims of domestic violence to minimize, omit from, or alter their account of an incident for many reasons, which could include but are not limited to: fear of further abuse." *Id.* at 7. The witness's testimony, moreover, has the added disadvantage of being mediated through police reports, which pose abstraction and the risk of inconsistency, misstatement, or misunderstanding not attributable to the witness herself. *See id.* at 5–8.

Nevertheless, the question must be answered whether this testimony, so transmitted, could reasonably constitute "clear and convincing evidence" that Petitioner is a danger to the community. *See Hernandez-Lara*, 10 F.4th at 40. To that end, the testimony itself suffers from an objective lack of corroboration and consistency. *See United States v. Zannino*, 895 F.2d 1, 6 (1st Cir. 1990) (discussing "indicia of reliability" for hearsay evidence). The arresting officer recorded that he "could not see any injuries on [the witness's] head as she complained about head pain." Dkt. 8-2 at 5; *cf. Lee*, 975 F.3d at 76 (approving reliance on "first-hand" report). And it was Petitioner, rather than the witness, who first called the police. Dkt. 8-2 at 7. Perhaps in some relation to this fact, the witness stated that she "was yelling in the background when [Petitioner] was on the phone trying to tell the dispatcher that she needed police." *Id.* But then it must be explained why, when

14

the police did arrive, she declined to report any acts of violence.[19]  *Id.*  Finally, there is the fact that the witness was apparently unwilling to cooperate with the prosecution.[20]  Dkt. 1-7 at 3; *cf.* *Zannino*, 895 F.2d at 6–7 (approving use of hearsay testimony given "under oath").  All of this might be readily explained, and perhaps much of it would have been explained in another proceeding.  But on the record before the Court—the same record that was before the immigration judge—one could not reasonably "come to a clear conviction, without hesitancy, of the truth of the precise facts in issue."  *See Cruzan*, 497 U.S. at 285 n.11.

The Court has largely ignored Petitioner's proffer, intended to rebut any evidence of present dangerousness (or flight risk).  *See generally* Dkts. 1-3, 1-4, 1-6.  This was intentional: if DHS had presented reliable evidence of recent violence, it would have been particularly difficult (though perhaps not impossible) for Petitioner to argue, as a matter of law, that such evidence was rebutted for purposes of the ultimate dangerousness finding.  In any event, that is not the case here, where DHS clearly failed to carry its burden.  As a consequence of that failure, Petitioner's continued detention violates due process.  *See Hernandez-Lara*, 10 F.4th at 41.

---

[19] There are yet other points about the testimony that are, at least, confusing, although some of these may be explained by the hearsay format.  For example, the incident report states that the witness told the police dispatcher that Petitioner was her "husband" and that he was "refusing to bring the baby back."  Dkt. 8-2 at 5.  But when officers arrived, they found Petitioner "in the apartment with their baby," *id.*, and in her interview, the witness clarified that she and Petitioner were not married but rather "used to be engaged," *id.* at 6.  Again, these might simply be a product of indirect transmission, in other words, entirely the police's misstatement or misunderstanding, rather than any obfuscation from the witness.  Nevertheless, there is nothing else to rely upon but these reports, and such inconsistencies must, at least, detract from the maximum reliability one might reasonably assign to them as documentary records.

[20] The Court notes that the dismissal was filed on February 17, 2026, Dkt. 1-7 at 3, three days before Petitioner moved the immigration court for release, Dkt. 1-3 at 2.  It is unclear whether the dismissal triggered Petitioner's arrest, or if the arrest prompted Petitioner to seek dismissal, or if the events are entirely unrelated.

IV.     **Conclusion**

For the reasons stated herein, this Petition is GRANTED.  Petitioner is hereby ORDERED

released.[21]

**So Ordered.**

                                                    /s/ Brian E. Murphy
                                                    Brian E. Murphy
Dated: March 31, 2026                               Judge, United States District Court

---

[21] In his Prayer for Relief, Petitioner asks the Court to specify that he be released "during normal business hours"; "in a well-populated area that is within a quarter mile of public transportation and not more than 30 miles from Petitioner's residence"; "with all personal documents . . . and belongings"; "without conditions"; "with attire appropriate to the weather conditions"; and "after having given at least six hours' advance notice to Petitioner's counsel of the time and place of Petitioner's release."  Dkt. 1 at 8.  While these requests seem eminently reasonable—and the Court suspects they are born of experience—the Court declines Petitioner's invitation to micromanage the release process at this juncture.  The Court will, of course, reconsider its stance should the process prove patently unreasonable.  Petitioner also seeks attorney's fees and costs.  *Id.* at 9.  Any such request should be filed within the deadlines set by the Equal Access to Justice Act.  *See* 28 U.S.C. § 2412.